IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOHN HACKEL,

                      Plaintiff,

   v.

NATIONAL FEEDS, INC., OHIO
CASUALTY INSURANCE CO.,
UNITED PET FOODS, INC., and
CINCINNATI INSURANCE CO.,

                      Defendants,

NATIONAL FEEDS, INC., and OHIO
CASUALTY INSURANCE CO.,

                      Cross Claimants and Cross Defendants,

   v.

UNITED PET FOODS, INC., and
CINCINNATI INSURANCE CO.,

                      Cross Defendants and Cross Claimants.

OPINION AND ORDER

12-cv-642-wmc

This lawsuit concerns allegedly defective mink feed.  Plaintiff John Hackel raises

mink and asserts various state law claims against National Feeds, Inc., which sold the

feed to Hackel, its insurer Ohio Casualty Insurance Co., United Pet Foods, Inc., which

manufactured the feed, and its insurer Cincinnati Insurance Co.  For ease, the court will

refer to defendant National Feeds and its insurer as "National" and defendant United Pet

Foods and its insurer as "United."  Both sets of defendants have asserted cross claims

against the other.

Before the court are two motions for summary judgment.  In one, National seeks

summary judgment on all of plaintiff's claims, arguing that:  (1) plaintiff's tort claims are

barred by the economic loss doctrine; (2) plaintiff's implied warranty claim is foreclosed by the express disclaimer on the product tags; (3) plaintiff has failed to plead his fraudulent misrepresentation claim with the specificity required by Wis. Stat. § 803.03(2); and (4) plaintiff's fraud claim also fails on the merits.  In the second motion, National seeks summary judgment on United's cross claims, arguing that (1) United's negligence and strict liability claims are barred by the economic loss doctrine; and (2) United's breach of contract claim fails because the plain language of the contract does not require National to test feed purchased from United.

For the reasons that follow, the court will grant National's first motion with respect to plaintiff's implied warranty claims, reserve as to the tort claims pending further submissions from the parties as discussed below, and deny the motion in all other respects.  As for National's second motion  with respect to United's cross claims, the court will grant it in its entirety.

PRELIMINARY MATTERS

Before turning to the undisputed facts, the court must first take up two preliminary matters.

**I.  Challenges to Plaintiff's Exhibits**

In opposition to National's motion for summary judgment, plaintiff offers several proposed facts about his specific purchases from National.  For the most part, National does not dispute these facts except to challenge whether certain documents relied on by plaintiff are properly authenticated and admissible.  Federal Rule of Civil Procedure

56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that *would be* admissible in evidence."  (Emphasis added.)  As far as the court can tell, National takes issue with plaintiff's counsel Attorney Brose's attempt to usher in "Exhibit D" as an attachment to his declaration without having the requisite first-hand knowledge to do so.

Purported to consist of "certain deposition exhibits," Exhibit D actually consists of five, separate documents or categories of documents: (1) National invoices to Hackel (dkt. #104); (2) National's answers to Hackel's interrogatories (dkt. #104-1); (3) National's accounts records, including delivery information for Hackel, bates-labeled "NF" (dkt. #104-2); (4) "Eurofins" reports, also bates-labeled "NF" (dkt. #104-3); and (5) internal National emails (dkt. #104-4).  While plaintiff's lumping of all of these documents into a single exhibit was sloppy, each of these documents is properly before the court at summary judgment pursuant to Rule 56(e)(2).

Hackel's invoices and account data appear to be business records and therefore self-authenticating under Federal Rule of Evidence 803(6).  Indeed, counsel for National attached invoices to *his* declaration that appear to be identical to those attached to plaintiff's counsel's declaration.  (Declaration of George Peek ("Peek Decl."), Ex. E (dkt. #71-5).)  The court may also consider interrogatory responses in reviewing a motion for summary judgment.  *See Johnson v. Holder*, 700 F.3d 979, 982 (7th Cir. 2012) ("Under Federal Rule of Civil Procedure 56(c), a district court 'may consider answers to interrogatories when reviewing a motion for summary judgment so long as the content of

those interrogatories would be admissible at trial.'") (quoting *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008)).

All of the remaining documents appear to have been produced from National's records in light of its Bates-labels or because of the inter-company nature of the communications, and therefore, are properly before the court at summary judgment since plaintiff likely would be able to authenticate them through National employees at trial. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941, 948 (W.D. Wis. 2008) (rejecting authenticity challenge at summary judgment where the challenged e-mails "were documents produced by defendant during discovery"). Moreover, these documents also appear to be deposition exhibits, labeled by defendant National as such and the related deposition testimony also submitted by plaintiff in opposition to defendant's motion for summary judgment demonstrates that the documents were authenticated by defendant's employees as statements of a party opponent, business record or otherwise subject to admission over a hearsay objection. *See id.* (also rejecting authenticity challenge where defendant authenticated email during deposition). (Declaration of Michael J. Brose ("Brose Decl."), Exs. B, C (dkt. ##93-2, 93-3).) To the extent National has some other, specific challenge to plaintiff's use of these proffered exhibits, it should have stated it, not relied on a blanket objection.

## II. United's Motion for Leave to File Summary Judgment

Also before the court is United's motion for leave to file a summary judgment motion, which plaintiff opposes. (Dkt. #89.) Dispositive motions were originally due on

August 2, 2013.  (Pretrial Conf. Order (dkt. #16).)  The court granted the parties' joint stipulation to extend that deadline by five weeks until September 9, 2013.  (Dkt. #43.)  In that order, however, the court cautioned that "there is no more give in the dispositive motion deadline (or briefing schedule) and the trial date is not moving."  (*Id.*)

On September 30, 2013 -- the date oppositions to motions for summary judgment were due -- United filed this motion for leave to file a motion for summary judgment.  (Dkt. #89.)  In the motion for leave, United simply argues that its proposed motion for summary judgment could resolve whether Hackel can assert tort claims against United and its insurer.  While this may or may not be so, United offers *no* reason for its *delay* in bringing the motion, and certainly has not demonstrated good cause for its lack of diligence.  *See* Fed. R. Civ. P. 16(b)(4) (providing that where a scheduling order is in place, modification of the order requires a showing of "good cause"); *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005) (internal citation omitted) (explaining that this standard primarily concerns the "diligence of the party seeking amendment").

While the court denies United's untimely motion for summary judgment against Hackel, United's proposed motion for summary judgment contains basically the same arguments asserted by National in its motion on plaintiff's claims.  Indeed, United regurgitated these same arguments in opposition to National's motion for summary judgment on United's cross claims, which amounts to a cross-motion for summary

judgment against National.[1]   Therefore, United's arguments presented in its proposed motion are before the court, although the court denies United leave to file an affirmative motion for summary judgment and ultimately rejects the arguments in that proposed motion.[2]

UNDISPUTED FACTS[3]

**A.  The Parties**

Plaintiff Jon Hackel resides in Edgar, Wisconsin and has been in the business of mink farming since 1979.

Defendant National Feeds, Inc. ("National") sells mink feed and is insured by Ohio Casualty Insurance Co.   Defendant United Pet Foods, Inc. ("United") manufactured the mink feed at issue and is insured by Cincinnati Insurance Company.

---

[1] Nothing in the court's scheduling order precludes a party from cross-moving for summary judgment in response to a motion for summary judgment.

[2] United is correct to point out that Wisconsin courts have extended the economic loss doctrine to bar tort claims asserted against a "remote" manufacturer, like defendant United.   *See, e.g., Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842, 844 (1998) ("[T]he economic loss doctrine bars a remote commercial purchaser from recovering economic losses from a manufacturer under tort theories of strict liability and negligence.").   Still, exceptions to the doctrine exist, and, as discussed below, this case is about whether the "other property" exception applies to the facts at hand.

[3] For purposes of summary judgment only, the court finds the following facts taken from the parties' proposed findings of fact to be material and undisputed when viewed in a light most favorable to the non-moving party.

### B.  Hackel's History with National

In 1980, Hackel began purchasing food products from National (at that time, known as "National Fur Foods") for use on his mink farm.  Except for one year in the mid-1980s, Hackel has always used National's product.  During that one year, Hackel used Purina feed, but found that product unacceptable for his purposes and switched back to National despite its costing more.[4]

In 2008, Hackel received a newsletter from National indicating that they had been sold by a small family company from Ohio, but that National would still be in a position to supply product and take care of ranchers.

### C.  National and United's Agreement

In December 2009, National and United entered into a "Toll Manufacturing Agreement" in which United agreed to manufacture mink food using National's proprietary formula.  This Agreement governed the relationship between United and National for all times relevant to this case.

The Agreement required United to meet express quality assurance standards with respect to finished food products.  The Agreement did not require National to perform quality assurance testing on the delivered food products.

---

[4] In 2006, Hackel similarly switched back to National's supplement after trying a competitor's.

**D. Hackel's Purchase of Allegedly "Nonconforming" Feed**

Hackel purchased a "Mink Reproduction" product from National in February 2010, which was manufactured by United pursuant to the Agreement with National. Hackel received this product on February 10 or 11, 2010, and received an invoice for the feed on February 19, 2010.  Hackel fed his minks the product between February of 2010 and April 20, 2010.

Approximately seven to ten days after receipt of the purchase, Hackel began to notice problems with the mink's reaction to the Mink Reproduction product.   On or about February 19, 2010, Hackel alerted National's owner Ed Buschur that he suspected a problem with its product.  Specifically, Hackel noted that the mink were scratching the feed out of their pens and that the food smelled and looked different.  Hackel states -- and defendants do not dispute -- that during the call, there was "dead air" as Buschur did not comment.  Buschur suggested Hackel consider changing feed at that time.

United also manufactured a product called "Mink Lactation" based on National's formula around February 12, 2010.  Hackel received a shipment of this product on March 31, 2010, for which he was invoiced on April 6, 2010.  Hackel fed his minks this product between April 20 and May 20, 2010.  Hackel claims that this product was also "nonconforming and outside of quality assurance and quality control standards."  Hackel contends that National was aware of its nonconforming nature after it received the "Eurofins analysis" shortly after March 29, 2010, but that National chose to do nothing

in response to that analysis.[5]   National's nutritionist, Andreas ("Dre") Sanders, conceded in his deposition that "the AOM was -- was too high," and if that was what Hackel meant by "nonconforming," then the February 12, 2010 Milk Lactation was nonconforming. (Deposition of Andreas Sanders (dkt. #93-3) 77.)[6]

On April 4, 2010, United manufactured yet another batch of Milk Lactation for National.  Hackel received product from this batch on May 17, 2010, and fed it to his mink through May 30, 2010.  Unlike the prior batch, Hackel contends that this product was conforming and within quality assurance and quality control standards.

On May 11, 2010, United manufactured a "GroMax" feed product pursuant to National's formula.  Hackel received GroMax from this batch on May 17, 2010, and fed the product to his mink between June 10 and June 29, 2010.  Hackel alleges that this product was also "nonconforming and outside of quality assurance and quality control standards."  Hackel further contends that National was aware of possible defects in the May 11th batch before June 4, 2010, when National received Eurofins preliminary test results.  Another batch of GroMax was produced on May 26 and delivered to Hackel on June 18, 2010.

---

[5] All parties fail to explain what Eurofins is, what the analysis concerned, or whether the analysis supports Hackel's conclusion that the product at issue was "nonconforming.

[6] The parties did not provide any information as to what "AOM" means, but from the deposition excerpts, the court infers that this measurement is somehow related to peroxide.  The parties fail to explain whether peroxide is an accepted component of the feed or how it otherwise impacts the quality of the feed.

### E. National's Knowledge of Problem with United Feed

In early May 2010, Hackel started noting additional problems with his mink, including a high mortality rate in mink kits, small size kits, and below normal litter sizes. On approximately May 27 or 28, 2010, Hackel contacted Al Newman, National's salesperson, to advise him of problems and ask if he could visit the farm to see them firsthand.  On June 3, 2010, Newman, National's owner Buschur, and its nutritionist Sanders all met with Hackel at his farm.  National did not take any samples of its products during that visit.  During this visit, Buschur represented that "everyone he's talking to rancherwise was having great luck" with National's products containing poultry oil.  (Deposition of Jon Hackel ("Hackel Depo.") (dkt. #75) 213-14.)

Sometime after June 4 but before June 29, 2010, National's salesperson Sanders again met Hackel at his farm and, according to Hackel, advised that "there were problems popping up with other ranchers but nothing to get really alarmed about."  (*Id.* at 226.)  On this visit, Sanders took a sample of the GroMax product with him for testing.

By June 4, 2010, National was aware of the possibility that GroMax was "nonconforming" based on Eurofins preliminary results.  After learning of the problem with GroMax, National emailed Milk Specialties, a warehouse in New Holstein, Wisconsin, requesting a list of customers and advising that Milk Specialties should stop further delivery of GroMax.  National never reviewed its own records to determine if any of the May 11, 2010, GroMax product was shipped to its customers.

On June 6, 2010, Newman emailed Buschur to report various conversations he had had with disgruntled customers who reported issues with the May 11, 2010, GroMax batch.  On June 9, 2010, National became aware of problems with the May 26, 2010, GroMax batch.  National, however, at that time, did not inform its customers of the nonconforming nature of the product.  On June 29, 2010, Hackel discontinued feeding his mink the United manufactured feed because he was not receiving any answers from National and he believed the feed was rancid.

On July 3, 2010, Hackel received a call from National's owner Buschur that the United feed was "no good."


**F.  Alleged Damage to Hackel's Mink**

Hackel contends that he sustained catastrophic damage to his mink herd, including the death of 1500 kits and many adult mink.  Many of the kits were cannibalized by adults.  Other kits and adults failed to grow and many of the female mink's reproductive systems were permanently damaged, which in turn damaged Hackel's breeding stock.  These direct damages also caused lost sales of pelts and added expenses to the farming operation, including the purchase of new equipment and conversion to a new feed system.

In late June or early July 2010, National's Sanders requested another sample of Hackel's GroMax feed for testing.  The Eurofins test results for this sample revealed that the GroMax was "nonconforming and outside of quality assurance and quality control standards."  In early July 2010, Hackel's new provider XK also tested Hackel's GroMax.

11

XK's analysis indicated that the GroMax was "outside of quality control and quality assurance standards."

### G. Warranty Language

Each delivery of product to Hackel from National Feeds included a product tag, which contained the following language:

> **LIMITED WARRANTY AND DISCLAIMER**
> Individual results from the use of this product may vary due to management, environmental, genetic, health, and sanitation differences.
>
> NATIONAL warrants that the feed contained herein meets the guaranteed analysis set forth on this label.  THERE ARE NO OTHER WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NOR ANY OTHER WARRANTIES, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO THIS PRODUCT.  The liability of NATIONAL, shall be limited to product price, and NATIONAL shall not be liable for any incidental or consequential damages.

(Peek Decl., Ex. A (dkt. #71-1).)

### H.   Overview of Claims

#### i.  Plaintiff's Claims against Defendants

In his amended complaint, Hackel asserts the following eight causes of action:

1. Breach of implied warranty of merchantability (against National)

2. Breach of implied warranty of fitness for particular purchase (against National)

3. Negligence (against National and United)

4. Strict liability (against National and United)

5. Strict liability -- failure to warn (against National and United)

6. Negligence -- failure to warn (against National and United)

7. Negligent misrepresentation (against National)

8.  Fraudulent representation pursuant to Wis. Stat. § 100.18 (against National)

Plaintiff's first two warranty claims sound in contract; the next five claims are tort claims.  *See Grams v. Milk Prods., Inc.*, 2005 WI 112, ¶¶ 9-10, 283 Wis. 2d 511, 699 N.W.2d 167 (explaining that breach of implied contract claim sounds in contract but that strict liability, negligence, intentional misrepresentation and strict responsibility misrepresentation all sound in tort); *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 29, 270 Wis. 2d 146, 677 N.W.2d 233 ("The economic loss doctrine has been applied by Wisconsin courts to bar claims of negligent and strict responsibility misrepresentation, and by federal courts applying Wisconsin law to bar claims of negligent, strict responsibility, and intentional misrepresentation.").   Plaintiff's last claim obviously sounds in Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18.[7]

All of the damages sought by Hackel, except for his request for punitive damages, relate to his economic losses.


ii.  **Defendants' Respective Cross Claims**

Both National and United assert cross claims against each other and their respective insurers.  National and its insurer Ohio Casualty Insurance Company asserts a cross claim against United and its insurer Cincinnati Insurance Co. for indemnification and contribution if National is liable to Hackel.  (Dkt. #29.)  This cross claim is not the subject of a motion for summary judgment.  United and its insurer also asserts cross

---

[7] That claim is not subject to the economic loss doctrine.  *See Kailin v. Armstrong*, 2002 WI App 70, ¶¶ 43-44, 252 Wis. 2d 676, 643 N.W.2d 132 (holding that the economic loss doctrine does not apply to fraudulent representation claims under Wis. Stat. § 100.18).

claims against National and its insurer for (1) breach of contract; (2) negligence; and (3) strict liability.  (Dkt. #27.)  National seeks summary judgment of all three cross claims.

## OPINION[8]

### I.  National's Motion on Plaintiff's Claims

#### A.  Application of Economic Loss Doctrine as Bar to Tort Claims

Under the economic loss doctrine in Wisconsin, as in a majority of other states that adopted this judicially-created rule in some form, contracting parties are generally precluded from pursuing tort recovery for "purely economic" or "commercial losses" associated with their contract relationship.  *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶¶ 33-35, 262 Wis. 2d 32, 662 N.W.2d 652.  Recognizing that the parties had a chance to allocate the economic risks at the time of contracting, the "doctrine generally 'requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim.'"  *Tietsworth*, 2004 WI 32, at ¶ 24 (quoting *Digicorp*, 2003 WI 54, at ¶ 34).

The court emphasizes the word "generally" because there are exceptions to the economic loss doctrine that have been recognized and tortured in their application by

---

[8] The court has subject matter jurisdiction over the parties' dispute pursuant to 28 U.S.C. § 1332(a).  Plaintiff Jon Hackel is an individual domiciled in Wisconsin.  Defendant National Feeds, Inc. is incorporated in the state of Ohio with its principal place of business in Maria Stein, Ohio.  Defendant Ohio Casualty Insurance Co. also is incorporated in that state with its principal place of business in Fairfield, Ohio.  Defendant United Pet Foods, Inc. is incorporated in Indiana with its principal place of business in Osceola, Indiana.  Finally, defendant Cincinnati Insurance Company is incorporated in Ohio with its principal place of business in Cincinnati.  In light of plaintiff's request for compensatory and punitive damages, the amount in controversy exceeds $75,000.

various states, Wisconsin certainly being among them, depending on nuances in the specific facts in the case before the court or how broadly the doctrine has been extended. Not surprisingly, plaintiff contends one such exception applies here.  Under the so-called "other property" exception, the economic loss doctrine "does not bar a commercial purchaser's claims based on personal injury or damage to property other than the product, or economic loss claims that are alleged in combination with noneconomic losses." *Grams*, 2005 WI 112, at ¶ 24 (quoting *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 402, 573 N.W.2d 842 (1998)).  In applying this exception, the Wisconsin Supreme Court has candidly acknowledged that "distinguishing between economic loss and physical harm to property other than the product itself is often a difficult task." *Id.* (quoting *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 932, 471 N.W.2d 179 (1991)).

Plaintiff contends that his stock of mink constitutes just such "other property" damaged by the allegedly defective feed product it had contracted for, thus placing damage to the mink outside of the economic loss doctrine.  To further complicate the doctrine's application here, there is an exception to the "other property" exception that must also be addressed:  if the damage falls within so-called "disappointed expectations" then the claims remain barred.  In other words, the economic loss doctrine *does* bar claims "in which a commercial product causes property damage but the damage was within the scope of bargaining, or . . . the occurrence of such damage could have been the subject of negotiations between the parties." *Grams*, 2005 WI 112, at ¶ 31 (internal citation and quotation marks omitted).  To determine whether damage to other property falls within

15

this disappointed expectations exception, a court must determine (1) what plaintiff's expectations were; and (2) whether the claim is about disappointment with those expectations. *Id.* at ¶¶ 50-51. Disappointment is measured from the perspective of a reasonable person in plaintiff's position. *Id.* at ¶ 53; *see also Foremost Farms USA Coop. v. Performance Plus, Inc.*, 2006 WI App 246, ¶ 19, 297 Wis. 2d 724, 726 N.W.2d 289 (describing an objective standard: "Should a reasonable purchaser in the plaintiff's position have foreseen the risk?").

This being Wisconsin, there are a few cases to which this court can turn for guidance as to considering whether damaged farm animals may fall under the "other property" exception to the economic loss doctrine and, if so, whether the damage done may fall under the "disappointed expectations" exception to that exception. In *Grams*, the seminal Wisconsin Supreme Court case recognizing the disappointed expectations exception, the Court considered whether the economic loss doctrine barred tort claims premised on damage to plaintiffs' calves allegedly caused by a non-medicated milk substitute or "replacer." After the Grams switched from a medicated milk replacer to a non-medicated product, they noticed certain problems developing in their calves, including a failure to gain weight and significantly increased mortality. *Grams*, 2005 WI 112, at ¶¶ 7-8. The Court found the Grams' tort claims barred, concluding that "[a] reasonable farmer would know that switching to an unmedicated milk replacer could cause some increase in calf mortality." *Id.* at ¶ 53. The Court recognized that the Grams "expected a lower increase in calf mortality than actually occurred, but that does not

change the fact that the calves' nutrition -- or, unfortunately in that case, malnutrition -- was at the heart of the bargain the Grams made." *Id.*

The holding in *Grams* had been anticipated by earlier Wisconsin cases involving defective animal feed products.  For example, in *D'Huyvetter v. A.O. Smith Harvestore Products*, 164 Wis. 2d 306, 475 N.W.2d 587 (Ct. App. 1991), the Wisconsin Court of Appeals considered whether a farmer's tort claims for damages to animal feed stored in an allegedly defective Harvestore silo, and in turn harming the farmer's cattle, were barred by the economic loss doctrine.  That court held the economic loss doctrine barred the farmer's tort claims because the alleged damage to other property fell within the "disappointed expectations" exception:  "The expected function of the Harvestore was to enrich the feed, providing enhanced nutrition for the cows.  The damages stem from the failure of the Harvestore to perform as expected and not from injury to another person or property."  *Id.* at 328, 475 N.W.2d at 595 (internal citation and quotation marks omitted).

On the other hand, the Wisconsin Court of Appeals distinguished *Grams* and *D'Huyvette* on arguably similar facts just a year after the *Grams* decision was handed down by the Wisconsin Supreme Court.  In *Foremost Farms USA Cooperative v. Performance Plus, Inc.*, 2006 WI App 246, 297 Wis. 2d 724, 726 N.W.2d 289, the defendant manufactured a "defoamer," a product used to reduce foaming during the production of food products, which the plaintiff used in its production of dairy products, including reconstituted milk ("recon").  2006 WI App 246, at ¶ 2.  While the defoamer worked as expected to reduce foam in the recon, plaintiff "discovered that some of its end dairy

17

products were defective" because the recon produced using defendant's defoamer contained phenol, which rendered the end product "off odor and off flavor" and "unfit for human consumption." *Id.* at ¶ 7. On these facts, the Wisconsin Court of Appeals vacated the trial court's summary judgment decision dismissing the plaintiff's tort claims, explaining that a material factual dispute remained over whether "Foremost should have anticipated that the defoamer might function properly as a defoamer, yet contain a contaminant such as phenol that might damage Foremosts' recon and, eventually, its end dairy products." *Id.* at ¶ 35; *see also State Farm Fire & Cas. Co. v. Hague Quality Water, Int'l*, 2013 WI App 10, ¶ 16, 345 Wis. 2d 741, 826, N.W.2d 412 (holding that the economic loss doctrine did not bar plaintiff's tort claims involving damage to a home caused by a leak in a water softener, reasoning that the damage was not caused by "a failure of the water softener to soften water but by a defect independent of the water softener's function of softening water" and therefore outsider of the purchaser's expectations).

Admittedly, it is hard to reconcile the application of the economic loss doctrine exception in the four cases discussed above, much less discern a principled approach to applying those cases to the facts before this court. *Grams* and *D'Huyvetter* found that sickly dairy calves and undernourished cows caused by defendant's non-medicated milk substitute and underperforming silo, respectively, were foreseeable risks that should have been the subject of bargaining between the contracting parties and bar any tort recovery, certainly support a similar finding here.

18

In response, plaintiff attempts to distinguish the Wisconsin Supreme Court's decision in *Grams*, focusing on the fact that the plaintiffs in *Grams* had negotiated to purchase a milk replacer without medication -- likely a poorer quality, substitute feed product from the medicated milk successfully used in the past.  While this fact arguably makes *Grams* an easier case than the case at hand, the Wisconsin Supreme Court's discussion of what constitutes disappointed expectation does not appear to have turned on this particular fact, but rather on what economic losses were reasonably foreseeable and, therefore, negotiated (or could have been negotiated) in advance by parties to a commercial contract.  Since this inquiry turns on whether the damage to other property could have been anticipated, a plaintiff need not have bargained for a lesser quality product for his expectations to be disappointed.

Still, from review of the Wisconsin Court of Appeals' more recent decisions in *Foremost* and *State Farm*, there would appear to be a line between damages resulting from a product which performs its core function badly and damages resulting from a product defective in some other way than failure to perform its intended function or use.  To the extent this further line drawing makes any sense, it may be because one category of damages is arguably more foreseeable than the other.  But this still begs the question whether a poor performing animal feed product -- even one resulting in lower productivity and increased mortality -- falls within disappointed expectations and whether a reasonable farmer should also have expected that a food product might effectively poison his animals.  As the Court of Appeals explained in *Foremost Farms*, "resolving cases in the middle of the spectrum will require a factual inquiry into what a

reasonable purchaser in the plaintiff's position would have foreseen." 2006 WI App 246, at ¶ 23. The question here is whether plaintiff has identified sufficient facts to preclude summary judgment on this issue.

In his proposed findings of fact, Hackel claims that defendants' mink feed products were "nonconforming and outside of quality assurance and quality control standards." (*See, e.g.*, Pl.'s Proposed Findings of Fact (dkt. #92) ¶ 20.) In his opposition brief, Hackel labels the feed at issue as "poison." (Pl.'s Opp'n (dkt. #90) 10.) Neither side, however, directs the court to evidence in the record definitively explaining the *nature* of the defect in the feed. Is it just that increased moisture reduced the shelf life, which would appear to fall within disappointed expectations under *Grams* and *D'Huyvetter*? Or, is it that the product contained some illicit ingredient rendering the product outright poisonous akin to adding phenol to a dairy product as in *Foremost*?

As a threshold matter, a fact finder will need to determine (1) the nature of the defect causing the damages sought and (2) whether the defect fell within a reasonable purchaser's expectations. More specifically here, a fact finder will need to determine whether the cause of damage to the mink was (1) the product's failure to provide sufficient nutrition and, therefore, barred by the economic loss doctrine, or (2) the product's containing a poison or other foreign substance doing affirmative harm to mink adults and kits and, therefore, allowed to be pursued under Wisconsin tort law. Given that neither side has effectively addressed what the evidence is on this crucial issue, plaintiff may have one week to provide the court with a written proffer of what he expects the evidence will show as to the *cause* of his damages and defendants may have an

additional week to provide a proffer in response.  In the meantime, the court will reserve

on National's motion for summary judgment on plaintiff's tort claims.

### B.  Implied Warranty Claims

National also seeks summary judgment on Hackel's warranty claims on the basis

that each delivered product contained a product tag disclaiming and limiting the

warranty of the mink feed products at issue.  As provided above, it is undisputed that

each product tag contained the following language:

> THERE ARE NO OTHER WARRANTIES OF
> MERCHANTABILITIES OR FITNESS FOR A
> PARTICULAR PURPOSE, NOR ANY OTHER
> WARRANTIES, EITHER EXPRESS OR IMPLIED, WITH
> RESPECT TO THIS PRODUCT.

(Peek Decl., Ex. A (dkt. #71-1).)   National contends that this plain, conspicuous

language disclaimed any warranty other than the express warranty (described on the

same product tag) "that the feed contained herein meets the guaranteed analysis set forth

in this label."  (*Id.*)  The "guaranteed analysis," also defined on the product tag, consists

of a breakdown of ingredients and nutritional makeup.

"An implied warranty is something the law reads into a contract to save the parties

the trouble of having to negotiate an express term; it is an off-the-rack term."  *Bushendorf*

*v. Freightliner Corp.*, 13 F.3d 1024, 1027 (7th Cir. 1993).  "If the parties don't like it, if

they would prefer to custom-make their own term, they are free to do so, free that is to

disclaim the implied warranty."  *Id*.  In adopting U.C.C. § 2-316, the Wisconsin

Legislature expressly provides the manner for accomplishing effective disclaimer of implied warranties:

> (2) Subject to sub. (3), to exclude or modify the implied warranty of merchantability or any part of it[,] the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness[,] the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

Wis. Stat. § 402.316.  There is no dispute that the disclaimer here meets each of the requirements for an effective disclaimer.  It was (1) in writing, (2) conspicuous, and (3) clearly stated that implied warranties of merchantability or fitness were disclaimed.

In response, plaintiff contends that the only warranty claim he is seeking is that the "product is fit for its ordinary purpose," and that warranty is embodied in the express warranty tag attached to each product.  (Pl.'s Opp'n (dkt. #90) 12.)   Unfortunately for plaintiff, however, the express warranty, as quoted above, states no more than that the feed will meet the "guaranteed analysis set forth in this label," and the "guaranteed analysis" on the label simply lists the ingredients and the nutritional makeup.  (Peek Decl., Ex. A (dkt. #71-1).)

As National points out in its reply brief, there is another problem with plaintiff's shifting to an express warranty claim.  While plaintiff alleged *implied* warranty claims, it appears from his opposition brief that plaintiff is now attempting to assert an *express* warranty claim.  The problem is that plaintiff has never *pled* such a claim.  Even if he had, plaintiff's claim for breach of express warranty here would require proof that the

defective feed did not meet the "guaranteed analysis" as that term is defined on the label. If that is plaintiff's theory of recovery, however, plaintiff's tort claims are certainly barred by the economic loss doctrine.

In any event, the court need tarry no further over plaintiff's reasons for failing to plead an express warranty claim. In deciding the present motion for summary judgment, the disclaimer on the product tags forecloses the implied warranty claims Hackel actually asserted and the court will grant summary judgment to National as to those claims.

### C.  Fraudulent Misrepresentation Claim

#### i.  Challenge Based on a Lack of Specificity in Amended Complaint

In its opening brief in support of summary judgment, National simply argues that plaintiff failed to plead its fraudulent misrepresentation claim with the specificity required by Wis. Stat. § 803.03(2). As a preliminary matter, "[i]t is well settled that a federal court sitting in diversity applies federal pleading requirements even when the claim pleaded arises under state rather than federal law." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008). The distinction is a purely technical one, however, since this court has previously found it "likely that plaintiffs' claims for violation of § 100.18 are subject to the heightened pleading requirements of [Federal] Rule [of Civil Procedure] 9(b), which requires that 'in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *Ball v. Sony Elecs. Inc.*, No. 05-C-307-S, 2005 WL 2406145, at *4 (W.D. Wis. Sept. 28, 2005).

23

There is a more substantial, practical problem with defendant's Rule 9(b) motion at this late stage of these proceedings. We are now at summary judgment. To the extent there was a pleading defect, defendant should have timely moved to dismiss the amended complaint, allowing plaintiff an opportunity to replead. Even more practical, defendant could have -- and should have -- sought more specificity as to plaintiff's claim of misrepresentation through the discovery process. These failures incline the court to ignore this late Rule 9(b) challenge altogether.

Perhaps in recognition of the untimeliness of its motion, defendant to its credit effectively abandons the argument in its reply brief. Instead, defendant argues that plaintiff's claim fails as a matter of law because, among other reasons: (1) the alleged misrepresentations were not made to a member of the public as required by Wis. Stat. §100.18; (2) the alleged statement was not false; and (3) the misrepresentation was not made to induce behavior. Normally, this court would disregard arguments made for the first time in reply. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."). Here, however, plaintiff had a chance to conduct a deposition and file a supplemental opposition and, in that supplemental opposition, plaintiff asserts a "new" misrepresentation.

Given that both sides interjected new issues after plaintiff's initial briefing on summary judgment, the court will consider defendant's arguments for summary judgment

24

on this newly-claimed misrepresentation contained in plaintiff's supplemental opposition, while ignoring any other newly-raised arguments as untimely.[9]

### ii.   Challenge to the Merits

In his supplemental opposition, plaintiff states, without any citation to the record, that:  "Sanders, on behalf of National, visited Hackel at his farm after he had learned that the GroMax product was defective and after he had learned that Hackel may be in possession of the defective product.  Despite this knowledge, Sanders told Hackel he had nothing to worry about with regard to the quality of the product and that he would let Hackel know the results of Hackel's GroMax."  (Pl.'s Suppl. Opp'n (dkt. #116) 6.)  This statement is not entirely consistent with plaintiff's proposed findings or, more importantly, with Hackel's own deposition testimony.  Hackel testified that Sanders advised him that "there were problems popping up with other ranchers but nothing to get really alarmed about."  (Hackel Depo. (dkt. #75) 226.)

There is no dispute that Sanders' and Hackel's meeting occurred sometime between June 4 and June 29, 2010.  Hackel also contends that he continued to feed the defective product to his mink until June 29, 2010.  This, at least, leaves open a possibility that Hackel continued to use the defective product for a brief period after

---

[9] After submitting a 14-page opening brief, National submitted a 31-page reply brief and a 30-page supplemental brief on the sole issue of whether plaintiff has put forth sufficient evidence in support of his fraudulent misrepresentation claim.  The court expects developed arguments, with citations to the record, to be submitted with the motion. National's 30-page supplemental brief -- especially, in light of the modest length of plaintiff's supplemental opposition -- borders on abusive.  To avoid sanctions in the future, counsel should at minimum have moved for leave to introduce new arguments and material in reply.

Sanders visited the farm and assured him that there was "nothing to get really alarmed about." With that overview in mind, the court will address defendant's specific challenges to Hackel's fraud claim.

Section 100.18 provides in pertinent part:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any … merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, … an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of . . . which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1). To recover under this statute,[10] plaintiff must demonstrate three elements: "First, that with the intent to induce an obligation, the defendant made a representation 'the public.' Second, that the representation was untrue, deceptive or misleading. Third, that the representation caused the plaintiff a pecuniary loss." *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 732 N.W.2d 792.

---

[10] Subsection 11(b)2 provides: "Any person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees[.]" Wis. Stat. §100.18(11)(b)(2).

National argues that plaintiff's claim fails on its face because Sanders' statement -- or any other statement made by a National employee -- was not made to the public. While the Act does not define this term, the Wisconsin Supreme Court has held that a private statement made to an individual may constitute a statement to the public. *State v. Automatic Merchandisers of Am.*, 64 Wis. 2d 659, 664, 221 N.W.2d 683, 686 (1974). Whether the statement was made to plaintiff as a member of the public largely turns on "the particular relationship between the parties." *K & S Tool & Die*, 2007 WI 70, at ¶ 23. If a particular relationship exists between the parties -- *i.e.*, a contractual one -- then that relationship distinguishes plaintiff from a member of the public more generally. *Automatic Merchandisers*, 64 Wis. 2d at 663, 221 N.W.2d at 686; *Kalin v. Armstrong*, 2002 WI App 70, ¶ 44, 252 Wis. 2d 676, 643 N.W2d 132.

Here, Hackel and National had a long-stranding commercial relationship. Hackel had purchased feed from National and its predecessor dating back to 1980. Notwithstanding this relationship, Hackel argues that he was under no obligation to continue to purchase feed from National; indeed, Buschur knew that he was talking to other feed suppliers in the summer of 2010. (Pl.'s Suppl. Br. (dkt. #116) 5.) In *K & S Merchandisers*, the Court affirmed the trial court's decision to submit to the jury the question of whether plaintiff was a member of the public under § 100.18, concluding that "a reasonable jury could have made conflicting inferences or found in either party's favor." 2007 WI 70, at ¶ 30; *see also id.* at ¶ 14.[11] In that case, the plaintiff had made a

---

[11] The court was inclined to view the determination of whether a plaintiff is a member of "the public" under Wis. Stat. § 100.18(1) as a question of law for the court to determine. Case law, however, directs otherwise. *See K & S Tool & Die Corp.*, 2007 WI 70 at ¶¶ 2,

previous purchase of a die cast from the defendant and had initiated the sale which was the subject of the lawsuit in a subsequent conversation.

The court finds that plaintiff has raised a genuine issue of material fact as to whether he was a member of the public in support of his § 100.18 claim.  The parties were not in a contractual relationship and Hackel was under no obligation to make future purchases from National.  As such, the court will deny defendant's motion for summary judgment on this basis.

National argues that Hackel's claim also fails because Sanders' statement was not false.  Plaintiff has put forth sufficient evidence from which a reasonable jury could find that there was some defect to the feed, known to National on or before June 4, 2010, and that depending on the nature of the defect, Sanders' statement to Hackel that it was "nothing to really get alarmed about" could be untrue, deceptive or misleading.  This, too, is a question for the jury.

Finally, National contends that Hackel was not "induced" to act based on Sanders' alleged statement, because he did not make any further purchases after Sanders' visit, but further purchases are not required; continued "use" of the product is sufficient to trigger the plain language of the Act.  Wis. Stat. § 100.18(1).  Hackel contends that he continued to feed the defective product to his mink until June 29, 2010, after Sanders' earlier visit.  Based on this, a reasonable jury could infer (1) that Sanders' statement

---

30.  In light of this, the parties might consider whether an instruction on the nature of the "particular relationship" should be added to the standard jury instruction.  *See* WIS JI-CIVIL § 2418 (explaining "the public" requirement without any mention of the "particular relationship" test).

28

induced Hackel to continue to use the feed and (2) that he suffered a pecuniary loss because of it.  Accordingly, the court rejects National's motion for summary judgment on plaintiffs fraudulent misrepresentation claim pursuant to Wis. Stat. § 100.18.[12]


## II. National's Motion on United's Cross Claims

### A. Economic Loss Doctrine as Bar to Tort Claims

National contends that United's cross claims for negligence and strict liability are barred by the economic loss doctrine.  For all times relevant to this lawsuit, National and United had an Agreement governing their manufacturing relationship.   In response, United argues that:   (1) *plaintiff's* claims are barred by the economic loss doctrine, rendering United's claims moot; and (2) if plaintiff's claims are not barred, then United's claims also are not barred.  Not only does United fail to offer any case law or point to any exception supporting this syllogism, it fails to offer any argument as to why the doctrine does not bar *its* claims.

United alleges that National was negligent and strictly liable for any alleged damage suffered because it failed to conduct certain testing of United's finished products. While Wisconsin courts have stretched the economic loss doctrine well past its original scope,[13] United's claims comfortably fall within its original scope.  *See Digicorp*, 2003 WI

---

[12] Defendant also argues that National did not make any representations for the purpose of inducing an obligation (Def.'s Suppl. Reply (dkt. #119) 25), but, as the Wisconsin Supreme Court held in *K & S Tool & Die*, intent to induce is not an element of a claim under § 100.18.  2007 WI 70, at ¶ 19 n.6.

[13] John J. Laubmeier, Comments, *Demystifying Wisconsin's Economic Loss Doctrine*, 2005 WIS. L. REV. 225, 229 (2005) ("Since the initial recognition of the economic loss

29

54, at ¶ 34 ("the economic loss doctrine requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim, in order to preserve the distinction between contract and tort law").  United could have bargained for a testing requirement, but failed to do so.  *See id.* at ¶ 35 (explaining that one purpose of the doctrine it to "encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against that risk").[14]  Indeed, the Agreement provides for *United* to ensure that quality assurance standards are met.  Accordingly, the court will grant summary judgment to National on United's cross claims sounding in tort.

### B. Breach of Contract Claim

In response to National's motion for summary judgment, United concedes that it does not have a breach of contract claim because United "cannot cite to a single

doctrine, Wisconsin courts have significantly expanded the doctrine's scope and breadth.").

[14] As indicated below, United suggests that the court consider applying Indiana law to its breach of contract cross claim.  To the extent Indiana law should govern United's tort cross claims, they would be similarly barred under Indiana's version of the economic loss doctrine.  *See U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 745 (Ind. 2010) ("[U]nder longstanding Indiana law, a defendant is not liable under a tort theory for any purely economic loss caused by its negligence (including, in the case of a defective product or service, damage to the product or service itself)." (internal citation and quotation marks omitted)).  "[T]his rule precluding tort liability for purely economic loss—that is, pecuniary loss unaccompanied by any property damage or personal injury (other than damage to the product or service itself)—has become known as the 'economic loss rule [,]' and where injury to a product or service results in purely pecuniary loss, the economic loss rule prevents any recovery."  *Id.*  (internal citation and quotation marks omitted).

provision of the Toll Manufacturing Agreement that places [National] under a duty to provide [United] with tested formulas and obtain quality testing of finished products to verify that they conformed to NFI's standards before shipping them to Hackel." (United's Opp'n (dkt. #96) 14.)  Despite this concession, United asks the court to "give serious consideration to choosing Indiana law over Wisconsin law for purposes of deciding the rights and obligations of the parties under the Toll Manufacturing Agreement."  (United's Opp'n (dkt. #96).)  Why should the court take up a choice of law issue when United has essentially conceded there is no merit to its cross-claim under either state's law?  The court grants National summary judgment on United's cross claim for breach of contract and declines to consider whether Wisconsin, Indiana or some other state law should govern such a claim.[15]

## ORDER

IT IS ORDERED that:

1) Defendants National Feeds, Inc. and Ohio Casualty Insurance Company's motion for summary judgment on plaintiff Jon Hackel's amended complaint (dkt. #67) is GRANTED with respect to plaintiff's implied warranty claims (first and second causes of action), RESERVED as to the tort claims (third through seventh causes of action) and DENIED in all other respects;

2) Defendants National Feeds, Inc. and Ohio Casualty Insurance Company's motion for summary judgment on defendants United Pet Foods, Inc. and Cincinnati Insurance Company's cross claims (dkt. #63) is GRANTED;

3) Defendants United Pet Foods, Inc. and Cincinnati Insurance Company's motion for leave to file a summary judgment motion (dkt. #89) is DENIED; and

---

[15] To the extent this inquiry is relevant to National's cross claim against United, the court will take up this issue in determining appropriate jury instructions.

4) As to the portion of National's motion which this court has reserved ruling, plaintiff shall file a written proffer as described in the opinion above on or before December 16, 2013; defendants' response is due on or before December 23, 2013.

Entered this 9th of December, 2013.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge